# FRANK A. CITINO *v.* REDEVELOPMENT AGENCY OF THE CITY OF HARTFORD
## (AC 16900)

Schaller, Spear and Dupont, Js.

Argued September 23—officially released December 15, 1998

*Kevin B. Carroll,* for the appellant-appellee (plaintiff).

*Kenneth B. Kaufman,* assistant corporation counsel, for the appellee-appellant (defendant).

*Opinion*

DUPONT, J. The two main issues of this appeal are (1) whether the plaintiff, Frank A. Citino, was entitled to a judgment against the defendant Hartford redevelopment agency for alleged misrepresentations made by the defendant to the plaintiff and (2) whether the doctrine of inverse condemnation requires the conclusion that the plaintiff's real estate was taken for a public use by the defendant without just compensation in violation of the fifth and fourteenth amendments to the United States constitution and article first, § 11, of the Connecticut constitution.

The trial court did not rely on the doctrine of inverse condemnation in rendering its judgment for the plaintiff on count one of his complaint but, rather, concluded that a judgment should be rendered for the plaintiff on the basis of unjust enrichment of the defendant.[1] The judgment ordered damages to be paid to the plaintiff in the amount of $278,500, and ordered that the subject real estate be transferred by the plaintiff to the defendant free and clear of all mortgages, liens and encumbrances. The court did not award appraiser's fees or

---

[1] The plaintiff claims that count one of his complaint is sufficient to allege a cause of action for unjust enrichment as well as for inverse condemnation. The defendant argues in its brief that the allegations are insufficient to support a cause of action for unjust enrichment and that during the trial no mention was made of that cause of action. The defendant agrees that the allegations do support a cause of action for inverse condemnation. At oral argument, the defendant stated that the allegations were sufficient to state a cause of action for unjust enrichment. We need not decide the question in view of our conclusion that the plaintiff pleaded and proved an inverse condemnation claim.

attorney's fees to the plaintiff.[2] The plaintiff, in counts two and three of his complaint, also sought damages for negligent and fraudulent misrepresentation. He appeals from the judgment for the defendant on the latter counts. The defendant cross appeals from the judgment for the plaintiff on the first count of the plaintiff's complaint. The plaintiff claims, in connection with the cross appeal, that the trial court should have awarded him appraiser's fees and attorney's fees in connection with the first count, and that the trial court should not have ordered him to convey his realty.

This action arises out of activities in connection with a redevelopment project known as the Park-Squire-Wolcott project in the city of Hartford (city). The defendant agency, which was responsible for the redevelopment project, was created pursuant to the Redevelopment Act (act), General Statutes § 8-124 et seq.[3] Pursuant to the act, redevelopment agencies are authorized to prepare redevelopment plans,[4] to acquire property by eminent domain within redevelopment areas[5] and to

---

[2] The plaintiff's complaint sought money damages, interest, costs, attorney's fees and "such other relief as the court deems just and equitable." The plaintiff did not challenge the judgment as to count one and, therefore, the amount of compensation for his property awarded by the trial court is not involved in his appeal, although it is raised in the defendant's cross appeal.

[3] General Statutes § 8-126 provides in relevant part: "The legislative body of any municipality may designate as a redevelopment agency the housing authority of the municipality or the Connecticut Housing Authority, or may create a new redevelopment agency to consist of electors resident therein. . . ."

[4] General Statutes § 8-127 provides in relevant part: "The redevelopment agency may prepare, or cause to be prepared, a redevelopment plan and any redeveloper may submit a redevelopment plan to the redevelopment agency, and such agency shall immediately transmit such plan to the planning agency of the municipality for its study. . . . Such plan and any modifications and extensions thereof shall show the location of proposed redevelopment areas and the general location and extent of use of land for housing, business, industry, communications and transportation, recreation, public buildings and . . . the purpose of redevelopment. . . ."

[5] General Statutes § 8-128 provides in relevant part: "Within a reasonable time after its approval of the redevelopment plan as hereinbefore provided,

dispose of property within redevelopment areas to redevelopers.[6] Redevelopment agencies may also issue bonds[7] and accept grants and other financial assistance to further redevelopment projects.[8] The act further requires that municipalities approve certain agency undertakings, and it authorizes municipalities to appropriate funds to the agencies.[9]

The trial court found certain facts. The plaintiff purchased real property located at 457-469 Park Street and 17-19 Squire Street in Hartford on or about November

the redevelopment agency may proceed with the acquisition or rental of real property by purchase, lease, exchange or gift. The redevelopment agency may acquire real property by eminent domain with the approval of the legislative body of the municipality and in accordance with the provisions of sections 8-129 to 8-133, inclusive, and this section. . . ."

[6] General Statutes § 8-137 provides in relevant part: "The redevelopment agency, for the purpose of this chapter, may sell, lease or otherwise transfer for such sums as are agreed upon the whole or any part of the real property within a redevelopment area to the redeveloper or, if the real property is to be used for public purposes, to any appropriate public agency. . . ."

[7] General Statutes § 8-134 provides in relevant part: "For the purpose of carrying out or administering a redevelopment plan or other functions authorized under this chapter, a municipality, acting by and through its redevelopment agency, is hereby authorized, subject only to the limitations and procedures set forth in this section, to issue from time to time bonds of the municipality which are payable solely from and secured by: (a) A pledge of and lien upon any or all of the income, proceeds, revenues and property of redevelopment projects, including the proceeds of grants, loans, advances or contributions from the federal government, the state or other source, including financial assistance furnished by the municipality or any other public body pursuant to section 8-135; (b) taxes or payments in lieu of taxes, or both, in whole or in part, allocated to and paid into a special fund of the municipality pursuant to the provisions of section 8-134a; or (c) any combination of the methods in subsections (a) and (b) of this section. . . ."

[8] General Statutes § 8-135 provides in relevant part: "For the purpose of carrying out or administering a redevelopment plan or other functions authorized under this chapter, a municipality, acting by and through its redevelopment agency, may accept grants, advances, loans or other financial assistance from the federal government, the state or other source, and may do any and all things necessary or desirable to secure such financial aid. . . ."

[9] See General Statutes §§ 8-127, 8-134 through 8-137.

15, 1985. The defendant admitted in its answer that on or about May 30, 1988, the plaintiff met with officials from the defendant to secure financing in the form of a loan for the development of the two properties owned by him in an area to be redeveloped. At that time, the plaintiff was informed that the defendant wanted to acquire the property located at 17-19 Squire Street and 457-469 Park Street for purposes of a redevelopment project.

On February 15, 1990, the defendant approved a redevelopment plan for the Park-Squire-Wolcott project. The plan was amended on July 19, 1990. On September 14, 1990, the city council approved the plan as required by statute. See General Statutes § 8-127. The plan provided for the acquisition of eleven parcels of privately owned land located on Squire, Park and Wolcott Streets in Hartford. Property owners could retain their property if, within 180 days of the defendant's preliminary acquisition notice, rehabilitation plans were approved by the city's planning department and proof of financial resources sufficient to complete the proposed construction was presented to the agency. The plan, according to the trial court's memorandum of decision, provided that "[t]he . . . project activities will be financed through the city of Hartford's community development block grant program."

The plaintiff met with officials of the defendant on several occasions to discuss his retaining and developing both properties pursuant to the redevelopment plan. In October, 1990, the defendant told the plaintiff that he could keep both properties and develop them himself if plans for the new construction were submitted and approved and if he could provide the defendant with evidence of financial resources for the development. Also, in October, 1990, the city served the plaintiff with an antiblight citation concerning the Squire Street property. The plaintiff's buildings on Park Street and

Squire Street had been the sites of fires and, by 1990, the Park Street building had been totally demolished and the Squire Street building, although still standing, was uninhabited. The antiblight citation levied a fine of $17,820 against the plaintiff, and the plaintiff filed an appeal. Faced with the fine, the plaintiff secured financing in the form of a mortgage to rehabilitate the Squire Street property.

The plaintiff's proposal for the development of Park Street was rejected and, consequently, he was unable to secure financing for that property. Because the plaintiff failed to submit new plans and evidence of financial resources for the Park Street property, it was taken by the defendant by eminent domain on April 10, 1992. The plaintiff does not claim in this action that he was not fairly compensated for the taking of the Park Street property. He took no appeal claiming to be aggrieved by the statement of compensation; see General Statutes § 8-132;[10] nor did he take any action claiming negligent or fraudulent misrepresentation by the defendant as to statements about Park Street. The trial court specifically noted that when the Park Street property was condemned, the plaintiff "received by judicial award the fair market value of that property and any severance damage which would be appropriate to compensate [the] taking of the Park Street property."[11]

[10] General Statutes § 8-132 provides in relevant part: "Any person claiming to be aggrieved by the statement of compensation filed by the redevelopment agency may, at any time within six months after the same has been filed, apply to the superior court for the judicial district in which such property is situated, or, if said court is not in session, to any judge thereof, for a review of such statement of compensation so far as the same affects such applicant . . . ."

[11] The plaintiff does not claim in the present action that because of the confiscation of Park Street, Squire Street was thereby rendered useless for any reasonable and proper purpose; see *Wright* v. *Shugrue*, 178 Conn. 710, 713, 425 A.2d 549 (1979); or that the taking of Park Street resulted in a partial taking of his land, or that he did not receive any severance damages due him for the taking of Park Street only. See *Laurel, Inc.* v. *Commissioner of Transportation*, 180 Conn. 11, 36, 428 A.2d 789 (1980).

After the defendant acquired the Park Street property, the defendant acquired by eminent domain all of the other properties within the Park-Squire-Wolcott redevelopment area except the plaintiff's property on Squire Street. The plaintiff's Squire Street property was the only property not formally taken by eminent domain, but it was not removed from the redevelopment plan. The defendant, as of the date of trial, had not implemented its redevelopment plan and the subject area had significantly deteriorated since 1988 when the plaintiff and the defendant first discussed the redevelopment of the area.

The trial court expressly found that there has been no formal abandonment of the redevelopment project. The court found that the process had been slow but that significant steps were scheduled to take place in early 1997, and stated that it could not "predict, one way or the other, whether, or at which point in time the project will actually come to fruition so as to physically develop the redevelopment property."

The trial court found that "Squire Street was in fact able to be funded through various housing funding loans available through the public sector including the city of Hartford and the Capitol Housing Finance Corporation. The availability of those funds for the project caused the plaintiff to believe, though mistakenly, that adequate funding would be available to [rehabilitate the Park Street property]. . . . [T]he city of Hartford was putting additional pressure upon the plaintiff to renovate the Squire Street building, under threat of very substantial fines, which pressure was unwarranted, as the building was a part and parcel of the designated redevelopment area scheduled for public acquisition and redevelopment. Consequently the plaintiff, in reliance on that mistaken belief, and in response to the assessing of fines by the city, did reconstruct the Squire Street property, thereby incurring mortgage obligations

of $248,500." At the time Squire Street was reconstructed, the plaintiff's Park Street property had not yet been taken by eminent domain.

The plaintiff was told (1) that he could not demolish the Squire Street building and (2) that if he did, he would have to post a bond of $108,000, which would be forfeited if he did not replace the building within eighteen months. He was not told that if he did not do anything and let the property be condemned, the antiblight fine would be waived. The plaintiff rehabilitated his property at Squire Street to the satisfaction of the defendant. It was renovated with modern and updated appliances, but it was situated within an area of deteriorated and boarded-up buildings owned by the defendant. The defendant moved all of the tenants out of the adjacent buildings, which buildings are all now vacant and their grounds strewn with litter. Of the six apartments in the plaintiff's Squire Street property, only two were producing rent at the time of trial.

I

## THE PLAINTIFF'S APPEAL AS TO NEGLIGENT AND FRAUDULENT MISREPRESENTATION

The plaintiff sought damages for negligent and fraudulent misrepresentations by the agency.[12] Before turning to the substantive claims of the parties, we must

---

[12] The defendant did not plead by way of special defense, nor did it make any argument, that sovereign or governmental immunity would bar these tort claims. The defendant does not claim that it is the agent of a municipality or of the state, which could bar the plaintiff's claims for tortious acts, nor does the plaintiff allege that the defendant is an autonomous corporate entity authorized by the state and created by the city, but the agent of neither, which could allow suit against the defendant. See *Purzycki* v. *Fairfield*, 244 Conn. 101, 107, 708 A.2d 937 (1998); *Williams* v. *New Haven*, 243 Conn. 763, 766, 707 A.2d 1251 (1998); *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 26, 664 A.2d 719 (1995); *Norwich* v. *Housing Authority*, 216 Conn. 112, 123, 579 A.2d 50 (1990); *Gordon* v. *Bridgeport Housing Authority*, 208 Conn. 161, 167, 544 A.2d 1185 (1988); *Housing Authority* v. *Fetzik*, 110 R.I. 26, 32–33, 289 A.2d 658 (1972).

first address the trial court's failure to state the standard of proof used in making its findings that the plaintiff did not prove either negligent or fraudulent misrepresentation. Where a court's memorandum of decision "is silent as to the standard of proof used, it will be assumed [in a civil matter] that the one ordinarily applied in most civil cases, that of a fair preponderance of the evidence, was used." (Internal quotation marks omitted.) *Schaffer* v. *Lindy*, 8 Conn. App. 96, 105, 511 A.2d 1022 (1986); see also *Manaker* v. *Manaker*, 11 Conn. App. 653, 660, 528 A.2d 1170 (1987). *Kavarco* v. *T.J.E., Inc.*, 2 Conn. App. 294, 297, 478 A.2d 257 (1984), is a case in which the trial court found in the plaintiff's favor regarding a fraudulent misrepresentation claim without stating the standard of proof it used. We held that because fraud must be proven by a more exacting standard than a preponderance of the evidence and, because the trial court neither stated nor implied that it was applying the proper standard of proof, a new trial was required. Id., 297–98.

The present case involves a situation in which the standard of proof that should have been applied to the fraud claim is higher than a preponderance of the evidence. See *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 540, 661 A.2d 530 (1995). Because we hold that the trial court correctly concluded that the plaintiff failed to sustain his burden of proof as to the fraudulent misrepresentation claim under a preponderance of the evidence standard, the plaintiff could not have sustained his burden of proof under the higher standard of clear and convincing proof either. We conclude that the trial court's failure to state the standard of proof used does not necessitate a new trial in this case.

The plaintiff argues that the trial court incorrectly applied the law in deciding the plaintiff's misrepresentation claims in that the court incorrectly believed that the plaintiff had to prove that the defendant had

"assured" him that he would be allowed to develop both the Park Street and the Squire Street properties, and that the plaintiff had a burden to investigate the truth of the defendant's representations.

"On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) Id., 541. "[W]e will disturb the trial court's determination that the [defendant] made no fraudulent or negligent misrepresentations only if, in light of the evidence and the pleadings on the whole record, such a conclusion could not reasonably have been reached," given the facts and the law to be applied to the facts. *McClintock* v. *Rivard*, 219 Conn. 417, 427, 593 A.2d 1375 (1991).

The plaintiff alleges in his complaint that the defendant, through its agents, made certain false representations concerning the redevelopment plan, and the plaintiff's financing and development of both of his parcels of property. Specifically, the plaintiff alleges in the negligent misrepresentation count of his complaint that in reliance on the defendant's representations that it intended to implement its redevelopment plan as to both properties, he secured financing to rehabilitate his Squire Street property by obtaining a mortgage in the amount of $249,000 and by spending $130,000 of his

own funds. The plaintiff alleges that these representations were false when the defendant made them, and that the defendant knew or should have known that they were false and that they were made with the intent and purpose to defraud the plaintiff.[13]

The plaintiff's misrepresentation claims are predicated on statements allegedly made by agency officials. Specifically, when discussing with the defendant his proposal for the development of both the Park Street and Squire Street properties, the plaintiff was told by Alan Greenwald, an executive of the defendant redevelopment agency, that "we have plenty of money to do this project." The plaintiff also offered testimony supporting his claim that other agency officials told him that the Park Street project "was going to happen." The plaintiff argues that the defendant assisted the plaintiff with the renovations of the Squire Street property knowing that the plaintiff had refused to renovate Squire Street without also renovating Park Street and knowing that the plaintiff believed that he would be allowed to renovate both parcels.[14]

In the fraudulent misrepresentation claim, the plaintiff alleges that he developed extensive plans for both properties, which he submitted to the defendant in reliance on the defendant's representations that the plaintiff could develop both properties, but those plans were

---

[13] The defendant does not argue that the plaintiff's misrepresentation claims with respect to Park Street may be barred by the plaintiff's acceptance of the statement of compensation for the condemnation of that property. See *Russo* v. *East Hartford*, 4 Conn. App. 271, 273, 493 A.2d 914 (1985). The defendant also does not argue that the judgment for the plaintiff on count one for inverse condemnation would preclude a judgment for the plaintiff on either count two or count three because the plaintiff would then be recovering twice for the same damage. *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 22 n.6, 699 A.2d 964 (1997).

[14] At the time the plaintiff obtained financing for the renovation of Squire Street, on or about May 17, 1991, Park Street had not yet been acquired by eminent domain.

rejected. The plaintiff also alleges that the defendant had no plan to help him secure financing for his proposal, and that the defendant's representations to the contrary were false and made with the purpose of defrauding the plaintiff.

A

Negligent Misrepresentation

"Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact. *J. Frederick Scholes Agency* v. *Mitchell*, 191 Conn. 353, 358, 464 A.2d 795 (1983); *Miller* v. *Appleby*, 183 Conn. 51, 55, 438 A.2d 811 (1981)." *McClintock* v. *Rivard*, supra, 219 Conn. 427. "[Our Supreme Court] has long recognized liability for negligent misrepresentation. [It has] held that even an innocent misrepresentation of fact 'may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.' *Richard* v. *A. Waldman & Sons, Inc.*, 155 Conn. 343, 346, 232 A.2d 307 (1967) . . . ." (Citations omitted.) *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 217, 520 A.2d 217 (1987).

"The governing principles are set forth in . . . § 552 of the Restatement Second of Torts (1977): One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) *Burnham* v. *Karl & Gelb, P.C.*, 50 Conn. App. 385, 390, 717 A.2d 811 (1998); see also *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 57, 717 A.2d 724 (1998); *Parker* v. *Shaker Real Estate, Inc.*, 47 Conn. App. 489, 494–95, 705 A.2d

210 (1998). "[T]he plaintiff need not prove that the representations made by the [defendant] were promissory. It is sufficient . . . that the representations contained false information." *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, supra, 202 Conn. 218.

In the present case, the trial court found that "the plaintiff was never given *assurance* that he would be allowed to develop the Park Street property. Although he and others may have been told, informally, that there was money available for the redevelopment project, no specific commitment had been given to him . . . . Although any statement that there was the funding for the project may be generally accurate, in a general sense of that phrase, such statement would be far too general and superficial to be a basis for absolute reliance upon which to base a significant financial undertaking." (Emphasis in original.)

The trial court also found that the plaintiff had been advised initially that in order to exclude his Park Street property from the "property to be acquired" under the redevelopment plan, plans for that property would have to be approved and that " 'evidence of financial resources sufficient to complete the proposed construction' was required." The trial court found that the plaintiff nevertheless "embarked upon the renovations of Squire Street on the mistaken belief that if it was completed he would be allowed to construct Park Street. He also thought that he had a commitment for funding for Park Street. Neither of these beliefs was accurate, although honestly held by the plaintiff."

The plaintiff argues that the trial court stated the law incorrectly when it implied that for misrepresentation to exist, the defendant would have to have given the plaintiff *"assurance"* that he would be able to develop the Park Street property. The plaintiff argues that any statements that the defendant made to the plaintiff

could be a basis for misrepresentation even without "absolute reliance" on them by the plaintiff.

The trial court's references to whether the plaintiff was given "assurances" and to "absolute reliance" relate to the issue of whether the plaintiff's reliance on statements made by agents of the defendant was justified, an element of a cause of action for negligent misrepresentation. There must be a justifiable reliance on the misrepresentation for a plaintiff to recover damages. See *Burnham* v. *Karl & Gelb, P. C.*, supra, 50 Conn. App. 390; see also *Maturo* v. *Gerard*, 196 Conn. 584, 589, 494 A.2d 1199 (1985). The basic element of a claim for misrepresentation, however, is whether there was a misstatement. Here, the trial court specifically found that "there was no actual misrepresentation on the part of the defendant." Without a misrepresentation, there can be no justifiable reliance. On the basis of our review of the record, we hold that the trial court's finding that there was no misrepresentation on the part of the defendant was not clearly erroneous.

B

Fraudulent Misrepresentation

The trial court's finding that there was no misrepresentation applied to both negligent and fraudulent misrepresentation. The essential elements of a cause of action in fraud are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." (Internal quotation marks omitted.) *Parker* v. *Shaker Real Estate, Inc.*, supra, 47 Conn. App. 493; see also *Maturo* v. *Gerard*, supra, 196 Conn. 587. "All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery." *Bradley* v. *Oviatt*, 86 Conn. 63, 67, 84 A. 321 (1912);

see also *Kilduff* v. *Adams, Inc.*, 219 Conn. 314, 329–30, 593 A.2d 478 (1991). Additionally, "[t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as 'clear and satisfactory' or 'clear, precise and unequivocal.' " *Barbara Weisman, Trustee* v. *Kaspar*, supra, 233 Conn. 540.

Although a cause of action for fraudulent misrepresentation differs from an action for negligent misrepresentation, a plaintiff asserting a claim under either theory must first prove a false statement or false representation on the part of the defendant. In the present case, the trial court found that the defendant made no misrepresentations to the plaintiff. Accordingly, for the reasons we stated with respect to the plaintiff's negligent misrepresentation claim, we conclude that the trial court's finding that there was no fraudulent misrepresentation on the part of the defendant was not clearly erroneous.

## II

### THE DEFENDANT'S CROSS APPEAL

The defendant claims that neither unjust enrichment nor inverse condemnation can be the basis for the plaintiff's judgment on count one of his complaint. The defendant also claims that even if an inverse condemnation has occurred, the matter must be remanded for a hearing as to the proper amount of damages. We do not reach the question of whether the plaintiff was entitled to pursue a recovery based on the unjust enrichment of the defendant as the trial court concluded, because we hold that inverse condemnation has occurred.[15] We

[15] The defendant makes no claim nor has it pleaded a special defense of sovereign or governmental immunity, alleging that such immunity would bar the equitable remedy of unjust enrichment, and we do not consider the issue.

uphold the judgment of the trial court that the plaintiff is entitled to damages, but do so, as we may, for a reason different from that of the trial court. See *Cheshire* v. *McKenney*, 182 Conn. 253, 261, 438 A.2d 88 (1980).

Inverse condemnation occurs when there has been a taking, without compensation, for a public purpose, without an actual or physical appropriation of property. See *Laurel, Inc.* v. *State*, 169 Conn. 195, 201, 362 A.2d 1383 (1975). The question here is whether the acts of the agency are sufficient to equate to a taking.

The trial court found that the plaintiff's Squire Street property was "realistically economically useless" but that because the building has some physical use for a purpose permitted in the zone, a classic definition of inverse condemnation would not include the harm suffered by the plaintiff. The trial court did not squarely hold that the doctrine of inverse condemnation could not apply, stating that "[w]hether the plaintiff's plight falls within the traditional boundaries of the term 'inverse condemnation' is unimportant." Rather, the trial court "concludes that the plaintiff does have a cause of action in equity by virtue of the doctrine of unjust enrichment."

The trial court's statement that "traditional" inverse condemnation cannot exist where a building, although devoid of economic use, has some physical use for a purpose permitted by zoning must first be discussed. We begin by acknowledging that there is no doubt that a landowner "who, as a result of governmental action, suffers a *total* and permanent loss . . . is entitled to recover damages." (Emphasis added.) *Luf* v. *Southbury*, 188 Conn. 336, 342, 449 A.2d 1001 (1982). *Total* deprivation of property rights can constitute inverse condemnation. See id. The question we must answer, however, is whether anything less than a total and per-

manent loss of property or a property right can constitute an inverse condemnation.

The public good affects the uses to which private property may be put, and ordinarily requires no compensation to a landowner whose property is not directly involved in the public use and is not formally condemned by eminent domain, even if the public use results in the diminution of the landowner's property rights or a decrease in the value of private property. Whether the regulation and use of land for the public good results in a noncompensable event or amounts to an unconstitutional taking of an adjacent landowner's property for which damages are due is primarily a question of the degree of the interference with the landowner's use of the property. See id., 349. The deprivation must be a loss of "the *reasonable* and proper use of the property . . . ." (Emphasis added.) Id., 352.

If the acts of a governmental or sovereign entity have substantially destroyed the value of the plaintiff's real estate, the plaintiff is entitled to damages. See *Washington Market Enterprises, Inc.* v. *Trenton*, 68 N.J. 107, 120, 343 A.2d 408 (1975). Such acts include the failure to effectuate a redevelopment project with reasonable dispatch, thereby allowing the passage of time to render the property shorn of almost all value. See id. Courts are empowered to provide a remedy for a taking without just compensation. *Russo* v. *East Hartford*, supra, 4 Conn. App. 274. This is so because the fifth and fourteenth amendments to the United States constitution and article first, § 11, of the constitution of Connecticut provide that private property cannot be taken for public use without just compensation. For inverse condemnation to occur, property does not have to be appropriated by governmental action to the extent that no value remains. It is sufficient if use of property is severely restricted and its profitability greatly reduced as a result

of the action of the government. See *Laurel, Inc.* v. *Commissioner of Transportation*, 180 Conn. 11, 46, 428 A.2d 789 (1980). We conclude that inverse condemnation is not precluded where the property involved has not been stripped of all physical use for a purpose permitted by zoning.

A political subdivision with the power of eminent domain, such as the agency in this case, is subject to payment of damages in an inverse condemnation action based on an unconstitutional taking. See *Dishman* v. *Nebraska Public Power District*, 240 Neb. 452, 453, 482 N.W.2d 580 (1992); *Rice Hope Plantation* v. *South Carolina Public Service Authority*, 216 S.C. 500, 523, 59 S.E.2d 132 (1950); 27 Am. Jur. 2d, Eminent Domain § 823. Inverse condemnation is the doctrine asserted by landowners in actions initiated by them, instead of being an action initiated by a taking authority that had the right of eminent domain but did not exercise it, and is based on the constitutional proscription forbidding the taking of private property without just compensation. "Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. . . . Inverse condemnation is a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." (Citation omitted; internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 249–50 n.15, 662 A.2d 1179 (1995).

A condemning authority cannot prolong condemnation in a given case by actions that encourage deterioration by causing the destruction of some buildings and by ordering tenants to move and then abandoning the project. *Foster* v. *Detroit*, 254 F. Sup. 655, 663 (E.D. Mich. 1966), aff'd, 405 F.2d 138 (6th Cir. 1968). In an

inverse condemnation case, the question is whether there has been a deprivation of the beneficial use of the property. See *Cohen* v. *Hartford*, 244 Conn. 206, 220–21, 710 A.2d 746 (1998). There is a de facto taking of property if property rights are impaired by an authority that failed to exercise its power of eminent domain, with damages for the taking to be ascertained as of the date of the taking. See *Textron, Inc.* v. *Wood*, 167 Conn. 334, 345, 355 A.2d 307 (1974). There must be a substantial interference with the owner's property. "The precise dimensions of a 'substantial interference' sufficient to amount to a taking in the constitutional sense are not always clear since the concept of substantial interference is not a static one, but one that has developed over the years in response to the changing needs of our society." Id., 347. There must be an indication that the taking authority has reached a stopping point in the implementation of its plan for the public good.

Once the results of the acts of the authority have made it clear that the property owner is no longer able to use its property as it had before, and the landowner's capacity to dispose freely of its property has been for all practical purposes arrested, property has been taken in the constitutional sense. Enjoyment and use of the entire property need not be completely destroyed for land to be deemed taken. See *United States* v. *Causby*, 328 U.S. 256, 262, 66 S. Ct. 1062, 90 L. Ed. 1206 (1946). There need be only a near total destruction of the land's prior use and a marked depreciation in value. See id. The test is whether the property no longer has any reasonable and proper use and whether the economic utilization of the land has been, for all practical purposes, destroyed. See *Tamm* v. *Burns*, 222 Conn. 280, 284, 610 A.2d 590 (1992).

The plaintiff claims that the acts of the defendant and its failure to complete the redevelopment project within a reasonable amount of time have caused the

taking of his property.The plaintiff and the defendant first discussed the use of his property in terms of redevelopment of the area in which it was situated in 1988. During the following nine years, up to the time of trial, the defendant acquired the other ten parcels of land located in that area by eminent domain but did not formally acquire the plaintiff's Squire Street property. The plaintiff, according to the facts found by the trial court, was pressured by the defendant by its levy of a fine against him in 1990 to renovate the Squire Street building by borrowing funds.

Other facts either found by the trial court, or admitted by the defendant in its answer to the plaintiff's complaint, are that the defendant's officials told the plaintiff that they wanted to acquire Squire Street; that the plaintiff and the defendant met to discuss plans to acquire it beginning in August, 1988; that a redevelopment plan was approved by the city council of Hartford in 1990; that, in 1990, the plaintiff was advised in writing to meet with an official of the defendant and the plaintiff's architect to discuss a rehabilitation project for Squire Street; that, in 1991, the plaintiff obtained a mortgage to rehabilitate Squire Street; that the defendant never implemented its redevelopment plan; that the area surrounding the plaintiff's building has been destroyed; that the character and use of the plaintiff's building has been destroyed; that the plaintiff's property, in the words of the trial court, "now stands by itself, in the midst of the deteriorated and boarded-up buildings owned by the defendant"; and, that, even "if the redevelopment project is completed," the prospect of the plaintiff's building having "any realistic value in the private market is in fact nonexistent."

We hold that the defendant's actions in failing to implement its redevelopment plan for the area in a

reasonable amount of time, although not formally abandoning the plan, and in permitting the overall deterioration of the property within the area, amounts to a taking of the plaintiff's property without just compensation. The plaintiff has pleaded and proved an inverse condemnation for which damages are due.

We next turn to the proper measure of damages for the taking. The trial court rendered judgment for the plaintiff in the amount of $278,500, the cost of the reconstruction of his building and the value of the land on which the building stands, and ordered the plaintiff to convey his property to the defendant free and clear of all liens and encumbrances.

Because inverse condemnation is an alternate way in which property is taken when formal condemnation proceedings have not been instituted by a governmental taking authority; see *Bauer* v. *Waste Management of Connecticut, Inc.*, supra, 234 Conn. 249–50 n.15; it also requires payment to a landowner using the same methodology. The measure of damages governing both should logically be the same, and we therefore look to cases involving both eminent domain and inverse condemnation in our discussion of damages.

"The general rule is that the loss to the owner from the taking, and not its value to the condemnor, is the measure of the damages to be awarded in eminent domain proceedings." *Gray Line Bus Co.* v. *Greater Bridgeport Transit District*, 188 Conn. 417, 427, 449 A.2d 1036 (1982). The rule need not be followed, however, if its application would produce an unfair result. See id., 427–28. The objective of damages is to award "just compensation," however damages are calculated. In some instances, benefit to the taker can be the value of the property taken if the public authority receives a windfall to the detriment of the landowner. See id., 430. "It is not unheard of for an owner to be faced with a

situation where his property, worthless to himself and to others who are not in a position to utilize it in some worthwhile fashion, has substantial value to only one person." Id., 430.

The loss to the owner, in the usual case, is fair market value, but such is not always the case because the question of what is just compensation is equitable, not legal. See *DeLucia* v. *Burns*, 11 Conn. App. 439, 527 A.2d 1234, cert. denied, 205 Conn. 803, 531 A.2d 935 (1987). The proper measure of damages is that amount of money that will put the landowner in as good a position in a pecuniary sense as he would have been in had the property not been taken. See id., 445. That measure of damages may require differing methods of valuation. See *Laurel, Inc.* v. *Commissioner of Transportation*, supra, 180 Conn. 37. For example, just compensation might be based on comparable sales, capitalization of income or replacement cost less depreciation or on any formula that puts the plaintiff in the position he would have enjoyed had the taking not occurred. A trier may select the method of valuation most appropriate to the facts of the case in valuing a land interest.

The present property, as found by the trial court, "has no actual economic value now." The trial court found that even if the redevelopment project is eventually completed, the building will not have any value on the private market. The trial court, therefore, determined just compensation to be the amount of the plaintiff's mortgage notes, which were signed by the plaintiff personally, plus the value of the land.

The trial court stated that if it had determined that inverse condemnation had taken place, the damages would have approximated the $278,500, which the trial court awarded as damages for unjust enrichment, because the replacement cost less depreciation plus

land as testified to by the plaintiff's expert real estate appraiser was $288,000. The trier need not calculate damages with mathematical precision but may approximate damages. See *Transportation Plaza Associates* v. *Powers*, 203 Conn. 364, 378, 525 A.2d 68 (1987).

A de facto taking, or taking by inverse condemnation, occurs when the state substantially interferes with private property so that the owner's use is substantially destroyed. It is difficult in cases such as the present one to determine exactly when the taking happened. Given the trial court's findings, the taking, the time when the unjust enrichment occurred, was complete when the defendant failed to implement the redevelopment plan and allowed the land to deteriorate to the point where it had little value. Such dates are impossible to ascertain.

The defendant argues that if there was an inverse condemnation, there must be a remand to determine the date of the taking and, when that has been established, to determine the dollar amount of just compensation. We do not conclude that there is a necessity for a hearing as to the date of the taking because we have determined that the trial court, in effect, established that a precise date of the taking could not be determined. Deterioration is a gradual process and, because the plan was never formally abandoned, there cannot be one date in time that marked the defendant's failure to implement its redevelopment plan for the area, unless it is the date of the last taking by eminent domain of property in the redevelopment area. In this particular fact situation, however, it does not matter exactly when the taking occurred because the compensation to the plaintiff is not based on fair market value as of a particular date, but on the plaintiff's loss based on his cost of rehabilitation and his land value.

Whether the measure of damages in this unique fact situation is the loss to the plaintiff based on the moneys

spent to rehabilitate the property taken and the cost of the land or is the gain to the defendant, which someday might proceed with its plan to redevelop the area, the dollar amount of just compensation would be the same and was correctly established by the trial court. Since an eminent domain and an inverse condemnation case are for practical purposes alike, the trial court correctly ordered the plaintiff to convey his property to the defendant.

The plaintiff claims that he should have been awarded appraiser's fees and attorney's fees, and he argues that General Statutes § 48-17b[16] or § 8-133[17] should be applied. The defendant argues that § 48-17b applies to inverse condemnation through acts of the state and does not apply to a redevelopment agency, and that § 8-133 does not apply because this case does not arise from a claim pursuant to § 8-132 by a plaintiff aggrieved by a statement of compensation. The issue is whether a state statute applicable to de facto takings by departments of the state is also applicable to redevelopment agencies, or, if not applicable, whether § 8-133, which is applicable to eminent domain cases, should be applied in inverse condemnation cases against a redevelopment agency. If the defendant was acting as an

[16] General Statutes § 48-17b provides: "The state court rendering a judgment for the plaintiff in an inverse condemnation proceeding brought against the state by the owner of real property, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements and expenses, including reasonable attorney, appraisal and engineering fees, actually incurred because of such proceeding."

[17] General Statutes § 8-133 provides: "If, as the result of any review under the provisions of section 8-132, the applicant obtains an award from the court greater than the amount determined as compensation by the redevelopment agency, costs of court, including such appraisal fees as the court determines to be reasonable, shall be awarded to the applicant and taxed against the redevelopment agency in addition to the amount fixed by the judgment."

agent of the state, § 48-17b would apply. If the defendant should be treated as though it took the property by eminent domain, rather than by inverse condemnation, § 8-132 would apply. The sums allowed pursuant to the two statutes are very different, with the possibility of a much greater out-of-pocket reimbursement being provided by § 48-17b. We are unaware of any Connecticut case that resolves the issue of whether costs, interest or any fees are due when a taking is deemed to have occurred by inverse condemnation by a redevelopment agency.

The agency in this case is authorized by state legislation to take by eminent domain and was created, pursuant to state legislation, by the city of Hartford. It is possible for a governmental entity to be an agent of the state for some purposes and an agent of a municipality for other purposes. See *Purzycki* v. *Fairfield*, supra, 244 Conn. 112. Whether an entity is acting as an agent of the state or of the city is usually a question of fact, depending on the particular acts of the entity and the events surrounding those facts. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 26.

A redevelopment agency stands in the position of a housing authority of a municipality. See General Statutes § 8-126. In two prior cases, housing authorities have been deemed to be the corporate agencies of the state without the necessity of a factual finding. See *Gordon* v. *Bridgeport Housing Authority*, supra, 208 Conn. 186; *Austin* v. *Housing Authority*, 143 Conn. 338, 349, 122 A.2d 399 (1956). Although a subsequent case noted, as dicta, that a housing authority is a hybrid organization "bearing many strong aspects of local authority and equally strong aspects of state authority," the two prior cases were not overruled. See *Norwich* v. *Housing Authority*, 216 Conn. 112, 122–23, 579 A.2d 50 (1990).

We follow existing precedent that holds that a redevelopment agency is an agent of the state. We, therefore, hold that § 48-17b applies to this case. The defendant was granted the power of eminent domain but chose not to use it, forcing the plaintiff to initiate its own action. The plaintiff is entitled to the costs and fees as therein provided.

The judgment is affirmed and the case is remanded for further proceedings to determine such sum as will in the opinion of the court reimburse the plaintiff for reasonable costs, disbursements and expenses, including reasonable attorney's, appraisal and engineering fees, actually incurred, to be added to the amount of the judgment rendered for the plaintiff.

In this opinion the other judges concurred.