[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, the town of Windham, has brought this action pursuant to § 12-161 of the General Statutes to recover municipal taxes from the defendant, ATC Partnership (ATC), upon a parcel of land that it had owned since 1987, and which had formerly been owned and operated by the American Thread Company as a textile mill in the Willimantic section of the town for many years until 1985, when it ceased its business operations. At the time of the filing of the plaintiff's complaint on November 13, 1996, an affidavit was submitted by the Windham tax collector in support of the town's application for a prejudgment remedy which stated that the total taxes levied on the property for the years 1992, 1993 and 1994 were $241,321.64, and that the interest charged on that amount as of October 1, 1996, was $133,992.64.
On December 18, 1996, the court (Sferrazza, J.) held an evidentiary hearing on the application and found probable cause that a judgment in the amount of $375,000 or more would be rendered in favor of the plaintiff. The court stated that there was "credible evidence that the defendants owe the plaintiff [the sum of] $382,396.36 in real estate property taxes, lien fees, and interest[ and also found] no credible evidence that any defenses, counterclaims, or setoffs will reduce these debts [and granted the application] in the amount of $375,000."
The defendant filed an answer denying that any taxes, interest or expenses claimed to have been incurred by the town in connection with the collection of the real estate taxes were due and payable as alleged in the complaint, and asserted a number of special defenses, first, that all taxes that were due had been paid, second, that the town was estopped CT Page 12114 from maintaining any claim for unpaid taxes, interest or expenses, and third, that the town "contributed the outstanding real estate taxes" in order to secure a grant from the state for the purpose of funding the economic redevelopment of the former American Thread Company mill complex by the Windham Mills Development Corporation (Windham Mills). ATC also pleaded "by way of setoff" that in May of 1994, the town, through its tax collector, issued and served an alias tax warrant resulting in the seizure and detention of certain machinery and equipment that ATC claimed to be its personal property, and that because it was "of historic value and irreplaceable", a replevin action claiming damages for its wrongful detention was brought against the town by ATC in December of 1994.
It should be noted that this tax collection action is one of four lawsuits between the parties arising from the condemnation by the town on September 9, 1994, of the forty acre former textile mill property; ATCPartnership v. Windham, 251 Conn. 597, 609 n. 9 (1999); "for the purpose of an ongoing redevelopment in northeastern Connecticut." Id., 600. An appeal was taken from a statement of compensation for one dollar ($1.00) filed by the town, and at the conclusion of the valuation trial, just compensation for the taking of the subject property was found to be $1,675,000. Northeast Economic Alliance, Inc. v. ATC Partnership,
Superior Court, judicial district of Windham at Putnam, Docket No. 94-0049248-S (September 14, 1999) (1999 Conn. Super. LEXIS 3314).
ATC thereupon filed a motion on September 16, 1999, requesting the court "to determine the rate of interest to be included in the judgment of compensation pursuant to General Statutes § 37-3c [and noted that] such interest should run from the date of the taking to the date of the payment ordered by the Court as just compensation." At a court session conducted on October 20, 1999, counsel for both the town and Northeast Economic Alliance, Inc. (acting as the "implementing agency" and condemning authority for the town pursuant to § 32-224 of the General Statutes) were advised by the court that because it had not "set a rate of interest on the amount of compensation awarded" as provided under § 37-3c, the alternate statutory method of interest computation (based on the averaging of the annual sales of United States treasury bills) showed that the accrued interest from the date of the taking to the date of the court's finding of just compensation on September 14, 1999, was $528,425.98, and that additional per diem interest of $315.05 would continue to accrue from that time until the date of payment, in accordance with the statute.
At the conclusion of the court's determination of the amount of prejudgment interest that had accrued, counsel were ordered to enter into a written stipulation concerning the amount of taxes assessed against the property together with interest, lien charges and attorneys' fees. The CT Page 12115 joint stipulation filed on October 28, 1999, states that although ATC reserves "all rights as to defenses and set offs, and to object to the reasonableness of the attorneys fees", both parties agreed that the taxes, interest and lien fees calculated by the tax collector and totaling $523,569.54 as of March 31, 2000. as stated in her affidavit attached thereto, were accurate and correct.
The efforts of the town to recover the back taxes claimed to be due on the American Thread Company Complex (Complex) culminated in the filing of a complaint dated May 18, 1994, in which it sought injunctive relief against ATC, and alleged that agreements were made "whereby the parties would cooperate to bring [state] financial assistance for the rehabilitation of the Complex [and] to support redevelopment of the Complex through the State Heritage Park system." Town of Windham v. ATCPartnership, Superior Court, judicial district of Windham at Putnam, Docket No. 94-0048597-S. Walter Pawelkiewicz, the town's first selectman, stated in an affidavit attached to the complaint that due to the "inactivity" of the Complex, the town "attempted to cooperate with the property owners in order to secure local taxes which were [owed and that after two] lump sum payments were received in the Spring of 1993 [a] payment plan was then arranged of $15,000 per month [but as] of the summer of 1993, no additional payments were received." Id.
He also stated that ATC's total tax delinquency as of that time of $251,755.82 was a "tremendous burden on the shoulders of the remaining taxpayers" as well as for the town administration of what he described as one of the most economically distressed communities in the state. He also noted in his affidavit that the "[t]own officials attempted to work with the property owners on areas of apparent mutual interest [and that ATC] sought state assistance to bring the property to a market ready condition [and as a result of the] initial cooperation [between the parties] the State [Bond] Commission awarded the project an additional $3 million in regional economic development bonding funds for the environmental remediation and rehabilitation of the first 100, 000 sq. ft. of space in a 5 year phase-in plan."
The first selectman's affidavit also states that the precipitating cause for the institution of the action for injunctive relief was the fact that the town was "tremendously concerned with the intention of [ATC] to remove valuable materials and property from the site for salvage and resale purposes [because many] of these artifacts are historically unique and are not replaceable [and that the] Heritage. Park project would be severely impacted by the loss of the historical items which were intended to be preserved for the public good and education." He also noted that the state historical commission had approved the master plan for the redevelopment of the Complex in which ATC participated and CT Page 12116 supported and that the town was concerned that the removal of any valuable material from the site would have "a negative impact on the Historical Commission resulting in the withdrawal of their support and jeopardizing additional state and federal aid without which the viability of this project is not likely."
The court file in the above-captioned case also contains a letter dated May 19, 1994, from counsel for ATC to the town's attorney which stated that "I have indicated to you that contrary to the allegations of the complaint, my clients have not removed anything from the premises and have no immediate plans to do so [and therefore] I have agreed, without court order, that my clients agree not to remove any contents until there is a hearing in this matter." It should also be noted that the action was withdrawn by the town on September 29, 1994, some three weeks after the condemnation of the Complex, although a hearing had been apparently scheduled by the court for October 6, 1994.
The alias tax warrant that is referred to in ATC's claimed setoff against the taxes assessed upon the real estate that comprised the Complex, was issued by Linda Theriault on May 18, 1994, in her official capacity as the tax collector for the town of Windham pursuant to §12-162 of the General Statutes. David Page, a Windham County deputy sheriff, testified that when she instructed him to serve the warrant, she told him that the town was concerned about the machinery and equipment in the Complex, and that she directed him to seize the property "in lieu of taxes" and to prevent the property from being removed from the premises, and that he then proceeded to secure and protect the property and to post notice to the public of its seizure.
The town's posttrial brief relies on the assumption that because the two statutory remedies for wrongful or excessive assessments by the town had not been pursued by ATC within the time periods prescribed under the provisions of §§ 12-111 and 12-118 of the General Statutes, although they were available and would have afforded "a convenient and effective opportunity" to procure "complete relief' from a wrongful or illegal assessment; Norwich v. Lebanon, 193 Conn. 342, 346-48 (1984); the special defenses asserted by the defendant are improper and should be stricken in this action to collect taxes pursuant to § 12-161 of the General Statutes. Hartford v. Faith Center, Inc., 196 Conn. 487, 489 (1985). ATC, on the other hand, argues that it is not challenging the underlying assessment, but rather is claiming that what it refers to as the "resulting tax debt obligation" has been paid or otherwise discharged because of the seizure of its personal property "in lieu of taxes" as well as the forgiveness of its "tax debt" as a condition of the state grant of three million dollars for the economic redevelopment of the Complex. CT Page 12117
 I
The arguments made by ATC in its posttrial briefs rest on the assumption that there exist "mutual debts" between the taxpayer and the town of Windham within the meaning of § 52-139 of the General Statutes which provides that" [i]n any action brought for the recovery of a debt, if there are mutual debts between the [parties to such action] one debt may be set off against the other." (Emphasis added.) The town, in this case, has elected to treat its claim as a debt collectible under General Statutes § 12-161 which provides that any properly assessed tax "shall become a debt due" from the person against whom it is assessed, and "[t]his statute gives an additional method for the collection of taxes and does not affect those provided by other statutes, such as by levy and lien." Sherwood v. Bridgeport, 123 Conn. 348,351 (1937).
The purpose of the statute "was to provide a simple remedy for the collection of taxes by ordinary action [but it] did not change, nor purport to change, the character of the obligation of a tax; it merely provided another remedy for its collection." Cromwell v. Savage,85 Conn. 376, 377 (1912). "A tax is not a debt in the ordinary sense of that term. It does not rest upon contract, either express or implied. It does not carry interest, and is not subject to set-off unless expressly so made by statute [and] it bears none of the characteristics of a debt [because in] its ordinary sense debt is substantially [the same as a contractual obligation]." Id., 377-78.
The collection of delinquent taxes has been held not to be a "debt" within the meaning of the Federal Debt Collection Practices Act (FDCPA) because that "statute contemplates that the debt has arisen as a result of the rendition of a service or purchase of property or other item of value"; Staub v. Harris, 626 F.2d 275, 278 (3d Cir. 1980); while taxes are public burdens imposed generally on the inhabitants of a municipality without reference to peculiar benefits to particular individuals or property. Id. The United States District Court for Connecticut has followed that court's ruling in holding that personal property taxes levied by a town on the ownership of a motor vehicle are not "debts" within the meaning of the FDCPA. Beggs v. Rossi, 994 F. Sup. 114
(D.Conn. 1997), aff'd, 145 F.3d 511 (2d Cir. 1998).
A tax does not establish a debtor and creditor relationship between the taxpayer and the municipality; it does not bear interest when past due, unless expressly provided by statute; it is not liable to setoff and it is not enforceable by a personal action against the taxpayer, in the absence of specific statutory authority to that effect. 71 Am.Jur.2d, CT Page 12118 State and Local Taxation § 5 (1973). On public policy grounds, a setoff is generally inadmissible against demands for taxes levied for local governmental purposes, in the absence of a statute authorizing the setoff. City of Waterbury v. Lawlor, 51 Conn. 171, 174 (1883); 20 Am.Jur.2d, Counterclaim, Recoupment and Setoff § 65 (1995); 16 E. McQuillin, Municipal Corporations (3d Ed. Rev. 1994) § 44.138, p. 571.
The court concludes that although § 12-161 of the General Statutes provides that "[a]ll taxes properly assessed shall become a debt due" from the taxpayer against whom they are assessed, they are not "mutual debts" within the meaning of General Statutes § 52-139 pertaining to the setoff of such debts, "because the nature of a tax is so essentially different from a debt in the ordinary sense of the word"; Anderson v.Bridgeport, 134 Conn. 260, 262 (1947); and "[t]he relationship between a taxpayer and the [town] or its collecting agency is not one of debtor and creditor nor is it regulated by a prior agreement, as between individuals." Hartford Fire Ins. Co. v. Brown, 164 Conn. 497, 505
(1973). Our Supreme Court has already unequivocally stated that in any action for the collection of municipal taxes pursuant to General Statutes § 12-161, any counterclaim that questions the validity of the tax on legal or equitable grounds cannot properly be considered by the trial court for important reasons of public policy, particularly where the defendant chose to await the town's attempts to collect the taxes before asserting challenges to their validity, and the rationale for its decision applies with equal force to the setoff asserted by ATC in this case. Hartford v. Faith Center, Inc., supra, 196 Conn. 492-94; Farmingtonv. Dowling, 26 Conn. App. 545, 551-52 (1992).
Accordingly, for all of the foregoing reasons, the court finds that ATC's claim of setoff constitutes an improper pleading in this statutory action which has been brought by the town for the collection of municipal taxes on real estate formerly owned by the defendant, because it challenges their validity contrary to the foregoing appellate court rulings, and the claim of setoff is not a "mutual debt" as between the parties, and their relationship "is not one of debtor and creditor nor is it regulated by a prior agreement, as between individuals." HartfordIns. Co. v. Brown, supra, 164 Conn. 505.
 II
The first of the claims briefed by ATC after the valuation trial had been completed, but prior to the court's finding of just compensation, was that the town's claims for taxes, and especially its claim for statutory interest on the back taxes, should not be allowed because the town "failed initially to pay fair compensation to ATC Partnership for CT Page 12119 the taking of the property [by eminent domain] which fair compensation would have allowed [it] to pay any such outstanding taxes [and is] contrary to [basic] principles of equity and constitutional principles of just compensation." The issue raised by the defendant's argument is whether under the facts of this case (supplemented by the facts found in the other three related cases previously referred to herein), substantial and compelling equitable or constitutional considerations justify the judicial abatement of the interest on the delinquent taxes which has been mandated by the legislature pursuant to § 12-146 of the General Statutes.
Delinquent taxes do not bear interest unless there is an express statutory provision imposing liability for such interest, and there are two principal reasons for this rule: (1) taxes are not debts in the ordinary sense of contractual obligations and are therefore not within the meaning of the general interest laws, and (2) because taxes are imposed by governmental entities they do not bear interest in the absence of express statutory authority to do so. 72 Am.Jur.2d, State and Local Taxation § 858 (1974). "It is, however, within the power of the legislature to provide that taxes remaining unpaid shall bear interest from the time when they are due and payable, and it is equally constitutional to provide that taxes which have already become delinquent shall bear interest from the time the delinquency commenced." Id.
Section 12-146 of the General Statutes provides that "the delinquent portion of the principal of any tax shall be subject to interest at the rate of eighteen per cent per annum from the time when it became due and payable until the same is paid [and each] addition of interest shall become, and shall be collectible as, a part of such tax." "The fact that the present action is brought under [the] authority of General Statutes, § 1231 [presently codified as § 12-161] permitting the collection of the taxes by a suit as a debt does not affect the amount of tax or the rate of interest to be computed thereon." West Haven v. Aimes,123 Conn. 543, 548 (1938).
The defendant's second special defense asserts that the town is estopped from pursuing any claim for unpaid taxes or "for maintaining the right to continue to accrue interest and/or expenses in connection with said taxes." A claim of estoppel against a governmental taxing authority will be rejected "when the party's only injury is that it must pay taxes legitimately owed under the correct interpretation of the law [and non-punitive] interest is, after all, nothing more than compensation for the use of money [because the] taxpayer had the benefit of using the funds before paying the tax claim and, in the legal sense, suffers no loss by reason of paying interest on the money it retained in its possession." Valencia Energy Co. v. Arizona Dept. of Revenue, 959 P.2d 1256, CT Page 12120 1268-69 (Ariz. 1998).
The application of the doctrine of estoppel against municipal corporations is not favored and is generally not applied in matters involving or affecting its governmental or public functions such as the taxing or police power. 28 Am.Jur.2d, Estoppel and Waiver § 152 (2000), citing Ackley v. Kenyon, 152 Conn. 392 (1965). This case involves the town's exercise of two quintessentially and universally recognized governmental functions, namely, the taxing power and the power of eminent domain, and as to the municipal exercise of the latter function, the New York Court of Appeals has held that just as the condemnee is entitled to interest on the award from the date of the taking as an essential component of just compensation, the condemning authority also has the right to recover tax arrearages as well as statutory interest that "cannot be modified or varied by any equitable considerations [because although] the tax statutes recognize that the city may take property by eminent domain, there is no provision for the cessation of interest uponthe happening of any such event [and the taxpayer-condemnee] can stopinterest running at any time by paying the delinquent taxes. (Emphasis added.) In re Public Parks at Rockaway Beach, 41 N.E.2d 454, 456-57
(N.Y. 1942).
This court (Stevens, J.), after reviewing the legislative history of General Statutes § 12-146, has recently held that the interest imposed on delinquent taxes pursuant to the statute is compensatory and non-punitive in nature and that "[t]he eighteen percent interest per annum was imposed primarily to ensure that municipalities receive fair compensation for delayed payment of taxes in light of fluctuating market rates, inflation, and collection costs." Town of Monroe v. 837 MainStreet Corp., 45 Conn. Sup. 283, 292 (1997); see National Loan InvestorsL.P. v. Town of Orange, 204 F.3d 407, 411-412 (2d Cir. 2000). "A taxpayer who bypasses [this state's] statutory remedies is barred from raising constitutional claims or a § 1983 claim as a special defense or counterclaim in a city's action to collect the tax [because the tax payer] was allowed by Conn. Gen. Stat. § 12-129 to pay her taxes under protest, which would have stopped the accrual of statutory interest, and to collect a refund if she prevailed." Finizie v. City of Bridgeport,880 F. Sup. 89, 95 (D. Conn. 1995).
Under the facts of this case, and for the foregoing reasons, it is ATC rather than the town that is estopped from challenging the statutory interest claimed to be due and payable in this action. See Ives v. NorthCanaan, 33 Conn. 402, 406 (1866).
 III CT Page 12121
The only one of the four actions between the parties arising from the town's decision to exercise its power of eminent domain on September 9, 1994 (after what had previously been a non-adversarial and cooperative relationship between ATC and the town for a number of years until May of 1994), that has been decided by our Supreme Court was a federal civil rights action based in part on the fact that town officials had ordered the Windham tax collector, Linda Theriault, "to levy an improper alias tax warrant on the personal property contained in the complex [because ATC] claimed that, at the end of the negotiations between [the parties the town] had given [ATC] an ultimatum: either accept $250,000 as a full and final settlement on all claims to the complex and any personal property located therein, or the [town] would condemn the property and award [ATC] the token sum of $1." ATC Partnership v. Windham, supra,251 Conn. 601. The Court affirmed the trial court's rulings in which it granted the town's motion to strike the complaint and entered judgment in favor of the defendants, but also observed that "[o]ur decision does not leave the plaintiff remediless [because it] remains free to pursue other avenues for relief that are better suited for its claim of improprieties in the seizure and condemnation of its property." Id., 617.
This court's memorandum of decision in the "conversion and replevin" action (referred to in footnote 9 of the Supreme Court's opinion at page 609) which is being filed simultaneously with the decision in this case, states that the machinery and equipment that was the subject of ATC's replevin action was not "personal property" as alleged in the complaint but were "fixtures" at the time of their seizure and detention. ATCPartnership v. Windham, Superior Court, judicial district of Windham at Putnam, Docket No. 95-0049838-S (September 29, 2000). In the alternative, the decision also finds that the doctrine of sovereign immunity "clearly applies to the equally essential element of wrongful detention" because the collection of municipal taxes is undoubtedly a governmental function. Id., pp. 12, 13.
One of the statutes dealing with the collection of taxes that can be used by a tax collector on his own initiative; Wilcox v. Madison,106 Conn. 223, 230 (1927); provides that "[u]pon the nonpayment of any property tax when due [any] collector of taxes, in the execution of his tax warrants, shall have the same authority as sheriffs have in executing the duties of their office, and may depute in writing any sheriff, deputy sheriff, constable or other officer authorized to serve any civil process to serve a warrant for the collection of any tax assessed, and the officer so deputed shall have the same authority as the collector concerning taxes committed to him for collection." General Statutes § 12-162. These provisions of the statute governing the issuance of alias tax warrants were challenged in an action for an injunction to restrain the collection of the tax on the grounds that their enforcement CT Page 12122 "would constitute the taking of [the plaintiff's] property without due process of law, and would work an irreparable injury to him, and that he has no adequate remedy other than that afforded by this action." Wilcoxv. Madison, supra, 224.
The Supreme Court rejected the taxpayer's claim that the alias tax warrant issued pursuant to the statute was illegal because it was issued without a judicial determination of liability for the tax payment and stated that although a tax warrant was "in the nature of an execution [it had always been] issued without any previous judicial determination of liability." Id., 230-31. It also held that the statute did not violate the due process clause of either the federal or state constitutions and stated that "[t]his method of collecting taxes without recourse to the courts is necessary to the full execution of the powers of the executive department of the State, and is not in violation of the division of powers made by the Constitution." Id., 231.
ATC asserts that the tax collector's instruction to the deputy sheriff to seize the machinery and equipment "in lieu of taxes" constituted what might be described as an "election of remedies" on the part of the town and that the value of that property (which was estimated by Jacob Pinson, an ATC partner, at the trial of the condemnation action as between $250,000 to $400,000), should be applied against the tax indebtedness. Although a similar claim by a condemnee who had invoked the same doctrine was made against the state in a highway condemnation case where an alternative contractual enforcement remedy was also available, our Appellate Court noted that "[t]he doctrine of election of remedies is equitable in nature, and its purpose is not to prevent recourse to any remedy, but to prevent double redress for a single wrong." DeLucia v.Burns, 11 Conn. App. 439, 446-47 (1987).
Our statutes provide three distinct and concomitant remedies for the collection of taxes, namely, levy under what is now § 12-155 of the General Statutes; tax lien under § 12-172; and collection by suit pursuant to General Statutes § 12-161, which the town chose to pursue in this case "in addition to the other remedies provided by law"; Id.;Bridgeport v. Equitable Title Mortgage Co., 106 Conn. 542, 546-47
(1927); and "[t]he choice and order of remedies was optional with the[municipal taxing authority]." (Emphasis added.) Id., 547-48; City ofDanbury v. Sullivan, Superior Court, judicial district of Danbury, Docket No. 303581 (December 4, 1991) (5 Conn.L.Rptr. 325). Accordingly, to paraphrase the Supreme Court in its decision rejecting the civil rights claims of the defendant, "simply because a taxpayer disputes the validity of the municipality's recourse to statutorily authorized mechanisms for the collection of local taxes"; ATC Partnership v. Windham, supra,251 Conn. 615; does not warrant judicial intervention based on the CT Page 12123 equitable considerations advanced by the defendant. Bryant IndependentSchool District v. Lamountt, 726 S.W.2d 192, 193-94 (Tex.App. 1987).
 IV
The question remaining for the court's consideration is whether or not credit should be given to the defendant against its tax indebtedness as alleged in its third special defense which states that "the plaintiff contributed the outstanding real estate taxes to the project [known] as the Windham Mills Development, in connection with seeking and receiving a grant or grants from the State of Connecticut concerning the development of said project." ATC makes the argument in its supplemental posttrial brief that the town's claim for taxes should not be permitted because the town used "the forgiveness of the outstanding taxes on the property" as the basis for its ten percent contribution that was a condition for receiving its state economic redevelopment grant and therefore has "obtained satisfaction of the debt or otherwise waived any right to [pursue its claim for taxes]."
The witness called by ATC who was most directly involved in the process of obtaining state funding for the redevelopment and rehabilitation of the Complex was Geri Langlois, who had served since January of 1993 as the executive director, and subsequently president, of Northeast Economic Alliance, Inc. (Northeast). Northeast had acted as the statutory implementing agency and condemning authority for the town pursuant to § 32-224 of the General Statutes.
Langlois testified that Northeast, the statutory "implementing agency" and condemning authority for the town under § 32-224 of the General Statutes, as well as Windham Mills, who acquired title to the Complex on November 10, 1994, from the town, were both nongovernmental non-profit and non-stock private corporations that had been organized for the purpose of implementing and fostering regional economic development. He also stated that in part, at least, grants from the state department of economic development (DED) were the source of funding from Northeast to Windham Mills for the redevelopment and rehabilitation of the Complex.
Langlois also identified various documents concerning the state grants for the projected redevelopment, including an opinion letter from counsel for Northeast dated March 18, 1994 (ATC Exhibit 16), stating that he had examined the contract for state assistance and certified that Northeast was a duly organized and acting non-profit organization that [had] the legal authority to undertake, contract for, carry out and finance the project [that was the subject of the contract and that it had] properly executed the contract in accordance with applicable state and local law [as well as a] resolution that [was] submitted to the Connecticut CT Page 12124 Department of Economic Development." A state department of economic development "Project Financing Plan Budget" dated April 12, 1994 and submitted to the agency and signed by Langlois as executive director of Northeast (ATC Exhibit 9), stated that the net cost of the Windham Mills Heritage Park Project for the budget period from November 1. 1993 through October 31, 1994, was $3,333,350 and that the funding source often percent of that amount, or $333,350, would be the town's "in-kind" local share that was described as "Property tax forgiveness" in the body of the document.
The minutes of a special town meeting held on July 12, 1994, (ATC Exhibit 13) were also introduced in evidence to show that the town had complied with the requirements of the Connecticut Economic Development and Manufacturing Assistance Act of 1990; General Statutes § 32-220
et seq.; including the town meeting's unanimous approval of the "Windham Mills Municipal Project Plan", its submission of the plan to the department of economic development, and its authorization of Northeast to condemn the forty acre Complex pursuant to § 32-224 and §§ 8-128
through 8-133. The minutes indicate that Langlois and the first selectman, Pawelkiewicz, responded to a question about the taxes the town would lose by saying that the state's grant would be 90% of the total "and only 10% from the town [and that] the town would eventually receive taxes from the Development Corporation."
Another document introduced by the defendant (ATC Exhibit 17) indicated that the State Bond Commission approved the grant on October 22, 1993, and stated that the grant of $3,000,000 "will be matched by $333,350 from the Town of Windham which includes a forgiveness of past due taxes, security and insurance costs and as an in-kind contribution of the Town's personnel." The last document introduced was a letter from Langlois to Pawelkiewicz dated October 16, 1995 (ATC Exhibit 18), in response to three questions raised by a member of the board of selectmen about the Windham Mills project, namely, first, "How much money have we received, and therefore, how much are the citizens now liable for?"; second, "How much of this have we paid?"; and third, "How did we pay this? With cash disbursements? To whom? By "in-kind' services?".
The written response to the first of the questions stated that Northeast had received two grants from the state, the first grant for $3 million and the second one for $2.7 million and that the 10% local in-kind share "does not obligate the municipality to provide a cash contribution [because] this requirement may be fulfilled with non-program income, federal funds, voluntary services, etc." The responses to the other two questions were that "[t]he Town of Windham has not made any cash contributions to this project [and that by] December 1995, the outstanding liability of the ATC Partnership will exceed $333,333 [and CT Page 12125 the] DED will allow us to use the loss of tax revenue to meet the non-DED share requirement."
The underlying concept of statutes intended to encourage business development "is that communities may invest in their future by temporarily foregoing tax revenues in order to attract new commercial and industrial developments to the area, thereby broadening the communities' tax base or employment opportunities for their citizens [and is] directed at those activities [that] impact upon the economic growth and labor market of the community." Long Island Lighting Co. v. Board ofAssessors, 616 N.E.2d 845, 846-47 (N.Y. 1993). The essential purpose for payments in lieu of taxes (PILOT) "is to reimburse affected taxing authorities for revenue lost by virtue of the real property tax exemption afforded industrial development agency projects [and an entity that has] conferred no benefit upon the project and would have derived no revenue from the project had it been subject to real estate taxation [has] no legal or logical basis for a distribution of PILOT payments to it."Hudson Falls Central School District v. Saratoga County IndustrialDevelopment Agency, 634 N.Y.S.2d 559, 560-61 (A.D. 3 Dept. 1995).
This court, in its determination of just compensation for the condemnation of the Complex has already recognized the fact that ATC "made major contributions [to the] lengthy, comprehensive and detailed economic development plan" which was one of the factors that helped to generate the state's funding of the project and it was that Master Plan that the court-appointed appraiser relied upon "in reaching his conclusion that the successful rehabilitation of the buildings was financially and practically feasible" and which resulted in the court's finding that "the highest and best use of the property as stated in the Plan . . . . was physically possible, legally permissible and financially feasible." Northeast Connecticut Economic Alliance v. ATC Partnership,
supra, pp. 10, 22, 24. The essential purpose of state grants in lieu of taxes is to reimburse a municipal taxing authority for the lost tax revenue that is a natural consequence of any ongoing commercial or industrial development project, and under the facts of this case there is no legal or logical basis for ATC's claim that it is entitled to the functional equivalent of a judicial abatement of the delinquent taxes assessed against the real property it formerly owned despite this court's award of fair and just compensation for the taking of the property as the result of its successful appeal from the town's statement of compensation.
Accordingly, judgment may enter in favor of the plaintiff, the town of Windham, upon its complaint against the defendant ATC Partnership, and against the defendant on its claim of setoff. CT Page 12126
This matter will be assigned for a supplemental hearing to determine the amount of taxes, interest, expenses and attorneys' fees.
Hammer, JTR