[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Commissioner of Transportation of the State of Connecticut (Commissioner) took by condemnation rights of access, easements and otherwise burdened two parcels of land known as 20 East Industrial Road and 26 East Industrial Road located in Branford and owned by the defendant Connecticut Shellfish Company (Conn. Shellfish) assessing damages at $7,060.00. The takings[1] were in connection with the relocation of southbound Ramp at 56 on Interstate 95 highway (Ramp 56).[2]
Conn. Shellfish operates a commercial fresh seafood processing plant in a building located at 26 East Industrial Road employing approximately forty-five persons. It receives most of the seafood at night which is stored in large walk-in refrigerators.
The takings by the Commissioner can be summarized as follows: (a) with respect to 20 East Industrial Road, a vacant industrial lot, 164 feet of a total of 215 feet of access were taken leaving 51 feet for access to the road; (b) with respect to 26 East Industrial Road, 54 feet of access were taken of a total of 300 feet of access, 538 square foot slope easement were taken, and a 2,831 square foot temporary easement to install and maintain traffic control equipment were taken[3]. The Commissioner reconstructed Ramp 56 so its southbound entrance and exit location is now within 100 feet of Conn. Shellfish's property which ramp was previously located approximately one-half mile from the subject property.
Conn. Shellfish took this appeal from the Commissioner's award in three counts[4], two of which seek the following: (1) reassessment of damages; and (2) inverse condemnation damages.
 I
"The owner of land taken by condemnation is entitled to be paid just CT Page 13253 compensation. Conn. Const. art. I § 11. If the taking is partial, the usual measure of damages is the difference between the market value of the whole tract with its improvements before the taking and the market value of what remained of it thereafter. The `fair market value' is the price that a willing buyer would pay a willing seller based on the highest and best possible use of the land assuming, of course, that a market exists for such optimum use." (Citations and internal quotation marks omitted). Minicucci v. Commissioner of Transportation, 211 Conn. 382, 387
(1989). Conn. Shellfish has the burden of proof. Levine v. Stanford,174 Conn. 234, 235 (1987).
The Court agrees with Conn. Shellfish that the taking of access of 164 feet of frontage of its 215 feet for 20 East Industrial Road is significant and adversely effects the value of the lot. The State merely passes this taking off as being insignificant, but it concedes that the "loss of access created an architectural challenge." Nevertheless, the Commissioner's appraiser fails to realistically recognize that the substantial damages that resulted from this taking of seventy-seven percent of the access to the road for 20 East Industrial Road. The Court finds that 20 East Industrial Road, consisting of 2.4 acres, had a fair market value before the taking of $325,000 and a fair market value after the taking of $210,000 resulting in damages in the amount of $115,000.
 II
The remaining damages that Conn. Shellfish seeks is based on the doctrine of inverse condemnation. "Inverse condemnation occurs when there has been a taking, without compensation, for a public purpose, without an actual or physical appropriation of property. See Laurel, Inc. v. State,169 Conn. 195, 201, 362 A.2d 1383 (1975). The [crucial] question is whether the acts of the agency are sufficient to equate to a taking."Citino v. Redevelopment Agency, 51 Conn. App. 262, 277 (1998).
26 East Industrial Road has decreased in value as a result of the relocation of Ramp 56. It is best described in the report obtained by the Commissioner from GET Consultants, Inc., as follows: "[t]he existing Exit 56 [prior to its relocation in front of 24 East Industrial Road] is a high volume interchange off Interstate 95 that serves an established industrial/commercial area of Branford along Leetes Island Road at East Industrial Park Road. In addition, significant truck traffic from I-95 utilizes Ramp 56 to access a major, existing truck stop on East Industrial Road."[5] As a result of the relocation of Exit 56, all the truck traffic is now dumped in front of 26 East Industrial Road.
Atlantic Traffic Design Engineers, Inc. (ATDE) measured this CT Page 13254 increase of traffic and found that as a result of Ramp 56 being relocated the truck traffic directed toward 26 Industrial Road would substantially increase.[6]
As a result of this increase of traffic, the fair market value of 26 East Industrial Road was adversely affected to the extent of 15 percent. The Court finds that the fair market value of 26 East Industrial Road before the relocation of Ramp 56 was $1,100,000 and after $935,000, resulting in a loss of $165,000.[7]
The inverse condemnation damages do not stop there. ATDE conducted an air quality impact study with respect to the effect of the traffic as a result of the relocation of Ramp 56 to the front of Conn. Shellfish at 26 East Industrial Road and it is significant.
The Court finds that, as a result of the truck traffic which will increase as much as 1171 percent during the evening as Conn. Shellfish receives its fish products,[8] the contamination which comes from truck emissions will also substantially increase and will in all probability infiltrate Conn. Shellfish's seafood process operation, making it necessary to take remedial action. Dr. Rafael R. Pedraja, an industrial chemist, with extensive experience in food science technology, testified and the Court finds that Conn. Shellfish products as a result of the increase in truck traffic will be exposed to pollutants that will adversely effect its products.[9]
Although the Court finds that Conn. Shellfish sustained its burden by a fair preponderance of the evidence, it was not necessary to reach this level. "[T]he landowner need not demonstrate that a more detrimental future use is likely to occur; all possibilities that would affect market value are relevant." Alemany v. Commissioner of Transportation,215 Conn. 437, 445 (1990). There is good reason for this their lesser burden. As the Commissioner conceded at oral argument, this is the only opportunity for Conn. Shellfish to be compensated for its damages. Simply put there is no second bite at the apple.
The Commissioner's defense is simple: No regulatory agency (state or federal) has required any remediation of the air quality in Conn. Shellfish's facility. That, however, ignores the fact that Conn. Shellfish, on its own, wishes to maintain the quality of its products by reducing Total Suspended Particulates, the airborne contaminants entering the facility, as a result of the truck traffic directed toward Conn. Shellfish's facility.
As the Appellate Court pointed out in Citino, "[t]he loss to the CT Page 13255 owner, in the usual case, is fair market value, but such is not always the case because the question of what is just compensation is equitable, not legal. See DeLucia v. Burns, 11 Conn. App. 439, 527 A.2d 1234, cert. denied, 205 Conn. 803, 531 A.2d 935 (1987). The proper measure of damages is that amount of money that will put the landowner in as good a position in a pecuniary sense as he would have been in had the property not been taken. See id., 445. That measure of damages may require differing methods of valuation. See Laurel, Inc. v. Commissioner ofTransportation, supra, 180 Conn. 37. For example, just compensation might be based on comparable sales, capitalization of income or replacement cost less depreciation or on any formula that puts the plaintiff in the position he would have enjoyed had the taking not occurred. A trier may select the method of valuation most appropriate to the facts of the case in valuing a land interest." Citino v. Redevelopment Agency, supra,51 Conn. App. 277.
In order to ensure the air quality, Stahlman Engineering Corp.[10]
(Stahlman) recommended and the Court finds it necessary, the following: the installation of a gas fired make-up air unit with associated ductwork and HEPA filters to each refrigerated room and dock be installed to create positive pressure in the rooms to minimize outside air infiltration" at a cost of $67,500; it will be necessary to install new sealant and weather stripping at the cost of $12,500 in order to prevent airborne contaminants from entering Conn. Shellfish's facility. Stahlman also recommended and the Court finds it to be necessary, the enclosure of finger docks at a cost of $85,000. There was also evidence from Stahlman that the engineering costs that will be incurred as the result of its recommended remedial work is $24,750 which is also allowed by the Court.
 III
In sum, the Court awards damages of $115,000 for the access taking of 20 East Industrial Road, $165,000 for the reduction in the market value of 26 East Industrial Road and $189,750 for remediation damages with respect to 26 East Industrial Road; in total damages of $469,750 less the deposit of $7060, in all $461,940 plus interest at the rate of eight percent per annum from May 4, 2000 to the date of judgment.[11]
 IV
The Commissioner argues that Conn. Shellfish is not entitled to reimbursement of the costs for its expert. Clearly, Conn. Shellfish is entitled to both the costs of the preparation and testimony of its real estate appraisal General Statutes § 13a-76; Alemany v. Commissionerof Transportation, 215 Conn. 437, 449-50 (including footnote 8 at 450). CT Page 13256 The Court has reviewed Marc Nadeau's the real estate appraiser, extensive reports and heard his testimony and concludes that his fee of $6500 (including the preparation for trial charges) is reasonable and is allowed as a taxable cost.
Likewise, the Commissioner objects to the fees of Joseph Stanger, the environment engineer in the amount of $13,610.32 and Dr. Rafael R. Pedraja, the toxicologist in the amount of $10,000, John P. Garcia, civil engineer in the amount of $10,847.25, and Christopher Ciocci, civil engineer in the amount of $1653.75, all of which are allowed.
The Court agrees with the Commissioner when he quotes from M. DeMatteoConstruction Co. v. New London, 236 Conn. 710, 715 (1996) that "[i]t is a settled principle of our common law that parties are required to bear their own litigation expenses, except as otherwise provided by statute." It, however, is provided by statute that, in a case of inverse condemnation, the Court is authorized to award "reasonable costs, disbursements and expenses. . . ." General Statutes § 48-17b.
In all, the Court awards expert witness fees and costs in the amount of $40,274.46.
Robert I. Berdon, Judge Trial Referee
[EDITORS' NOTE: SCHEDULE ”A” IS ELECTRONICALLY NON-TRANSFERRABLE.]
[EDITORS' NOTE: SCHEDULE ”B” IS ELECTRONICALLY NON-TRANSFERRABLE.]
 Schedule "C"
Dr. Rafael R. Pedaja reported that Conn. Shellfish shall be subject to the following which require remediation: "The would be pollutants are of biological, chemical and physical nature such as bioaerosols, gases (fumes), and dust and noise respectively.
"Bioaerosols. This term is used to describe airborne particulate matter of microbial origin, i.e., viruses, bacteria, fungi and their spores, and protozoans. These microorganisms can enter the plant through doorways, structural cracks, windows, cooling and air ventilating systems and establish themselves inside the plant. A typical example of a bacteria that has invaded food-processing plants through airborne contamination is Listeria monocytogenes. This bacterium has caused disease (listeriosis) and death through the consumption of contaminated product. Food contamination with Listeria has been the cause of massive recalls of food products already in the distribution channels. Other Pathogens (disease CT Page 13257 producing bacteria) such as Salmonella, E. Coli, Staphylococcus, and others can also become airborne, either as a bioaerosol or carried by dust particulates and consequently contaminate food. They may originate from organic detritus, animal feces, bird droppings, and other substances that may become airborne by conversion into small or microscopic particulates.
Molds and yeast and non-pathogenic bacteria can also contaminate foods and cause spoilage. Some molds are also pathogenic.
Dust. Dust is a contaminant, which can bring filth, microorganisms and other toxicants into a plant. Many bacteria travel on dust particles and can become invasive. Dust can be of inorganic or organic origin and can be the cause of allergic reactions in humans.
Toxic Chemicals. Motor vehicles, particularly those burning unleaded fuels emit large amount of toxic substances. The incomplete combustion of gasoline and diesel fuels by motor vehicles can cause discharges of pollutants into the air. Risks and benefits of each course of action to be taken have to be seriously considered by all parties concerned when it comes to a potential environmental hazard. For instance, cancer risk of one in a million due to chlorination of water may be acceptable, while cancer risk of one in a thousand from regular inhalation of gasoline vapors are clearly not acceptable; according to the U.S. Occupational Health and Safety Administration — OSHA (Hallenbeck, W.H. and Cunningham, K.M. 1986. Quantitative Risk Assessment for Environmental and Occupational Health. Lewis Publishers, Inc., Chelsea, MI).
Among dangerous contaminants produced as the result of incomplete combustion of organic matter are chlorinated dioxins. Dioxins and related compounds are likely to present a cancer hazard to humans. Much health concern exists over exposure to 2, 3, 7, 8 — tetrachlorodibenzo-p-dioxin (TCDD), one of 75 chlorinated dioxins. EPA has given a lot of consideration to those compounds."
Defendant's Exhibit 24.